UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| D.G. BNF B.G., | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. C-10-94 |
| | § | |
| FLOUR BLUFF INDEPENDENT | § | |
| SCHOOL DISTRICT, | § | |
| | § | |
| Defendant. | § | |

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

On March 1, 2011, the Court held a bench trial in the above-styled action. After consideration of the evidence and arguments presented by both parties, along with the applicable law, the Court finds as follows.

**I.   Background**

Plaintiff D.G., by next friend B.G. (his mother), filed this action in this Court on March 30, 2010 against Defendant Flour Bluff Independent School District ("Flour Bluff ISD"), alleging a violation of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. (D.E. 1.) Plaintiff filed an Amended Complaint on September 13, 2010. (D.E. 15.) The Court held a bench trial in this action on March 1, 2011, and held a second day of hearings on March 23, 2011. On April 20, 2011, Plaintiff submitted his Closing Arguments and Supporting Authorities. (D.E. 40.) Defendant responded on April 27, 2011. (D.E. 41.) Plaintiff submitted a Reply on May 9, 2011. (D.E. 44.)

At issue here is whether Defendant violated the IDEA "Child Find" provision, which requires that states identify, locate, and evaluate children with disabilities and develop practical methods "to determine which children with disabilities are currently

receiving needed special education and related services." 20 U.S.C. § 1412(3)(A);[1] Forest Grove Sch. Dist. v. T.A., __ U.S. __, 129 S. Ct. 2484, 2495 (2009) ("IDEA's 'child find' requirement [obligates] States . . . to 'identif[y], locat[e], and evaluat[e]' '[a]ll children with disabilities residing in the State' to ensure that they receive needed special-education services.").[2]

## II. Findings of Fact

Plaintiff D.G. is presently an eleventh grade student at Flour Bluff ISD, Defendant herein, and is currently receiving special education services pursuant to IDEA. (Trial Transcript at 40, 78-79, 115, 294.)

In fall 2008, D.G. began his ninth grade year at Flour Bluff ISD. He entered ninth grade with no significant history of behavioral problems or academic failure in the prior school year. Plaintiff's parents had divorced in 2007, and his grandparents had died around that time as well. Both sides agree that D.G. performed well in the 2007-2008 academic year, and he was "academically and behaviorally successful." (D.E. 41 at 1; see A.R. 489-490; Trial Transcript at 34-35.)

Soon after D.G. began ninth grade (in fall 2008), he started to exhibit behavioral problems, such as talking out in class, not following directions, refusing to sit still, talking back to teachers, repeated latenesses and absences, and other similar behaviors. (A.R. 473-477.) Due to these behavioral problems, D.G. was assigned to Flour Bluff ISD's disciplinary alternative school, the Student Discipline and Guidance Center

---

[1] 20 U.S.C. § 1412(3)(A) provides: "All children with disabilities residing in the State, including children with disabilities who are homeless children or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services."
[2] Although Plaintiff also brought a discrimination claim under Section 504 of the Vocational Rehabilitation Act, 29 U.S.C. § 794 (D.E. 15), Plaintiff no longer pursued this claim at trial.

("SDGC"), where students are subject to increased monitoring and discipline. Prior to his assignment to SDGC, D.G. had been on the swim team; he was removed from the swim team after his SDGC placement. (Trial Transcript at 37.) D.G. was first assigned to SDGC on or about October 28, 2008, and this assignment was to last for 31 "successful" days, meaning that a day would be counted only if the student's behavior was acceptable on a given day. (A.R. 473-76; 483; 494.)

Ultimately, D.G.'s behavioral problems did not improve at SDGC, as he continued to display impulsive, irrational, and disruptive behaviors. As a result, D.G. was not credited with many "successful" days at SDGC, and remained there for the fall 2008 term (until January 26, 2009). (AR 445-473, 481, 482; Hearing Transcript at 120.) During the period while D.G. was at SDGC, B.G. obtained a psychological evaluation of D.G. from Dr. Horvat (in which he had diagnosed D.G. with Attention Deficit Hyperactivity Disorder ("ADHD")), and in November 2008, gave a copy of this report to Defendant. (A.R. 418.) Meanwhile, D.G. continued to display behavioral problems and receive discipline reports. (A.R. 451-477; 481-482.) At no time, however, did Defendant evaluate whether D.G.'s conduct at SDGC was related to an underlying disability or health problem, or whether he would be aided by special education services.

On January 8, 2009, Defendant convened a Pre-referral Meeting (also called a "Student Assistance Team Meeting" or "SAT Meeting") to address D.G.'s behavioral problems, which included distractibility, excited utterances, failing to follow directions or complete assignments, and being late or skipping class. (A.R. 287-291, 416, 418.) When D.G. returned to his regular school from SDGC in late January 2009, he was failing several classes, including Physical Education, World Geography, Algebra 2, and Teen

Leadership, primarily due to his failure to complete assignments. (A.R. 243.) Around the time of the Pre-referral Meeting, one of Defendant's representatives made notes based upon a meeting with an individual at the Seashore Learning Center (which D.G. attended before Flour Bluff ISD), who reported that D.G.'s behavioral problems were not due to any mental or physical health condition, but rather that D.G. was cynical, unwilling to accept responsibility, and was reinforced in this behavior by a parent going through a divorce. (A.R. 281.)

After the Pre-referral Meeting, in January 2009, Defendant began to evaluate D.G.'s eligibility for classroom modifications pursuant to Section 504 of the Rehabilitation Act, citing ADHD. (A.R 578-582; A.R. 245-246.) D.G.'s teachers made reports, describing D.G.'s distractibility, poor attention span, and other issues, but did not state that he was non-compliant with teacher directives. (A.R. 248-252.) On January 26, 2009, Defendant reported the results of the evaluation, and started to develop a Section 504 accommodation plan, which primarily involved offering D.G. caffeine (in the form of tea) to increase alertness, as well as other modifications such as extended time for assignments, shortened assignments, preferential seating, and cooling off periods. (A.R. 578-579; 255-256; Hearing Transcript at 142.)[3]

B.G. was unsatisfied with the Section 504 accommodation plan, and in February 2009, asked Defendant's Section 504 representative if D.G. would be better served by a program other than Section 504. (A.R. 375, 280). At that time, however, B.G. was not

---

[3] Prior to the January 2009 meeting, B.G. obtained an updated psychological evaluation of D.G. from Dr. Kathryn Soward, which again stated that D.G. had ADHD and impulsivity. (A.R. 259, 266.) Soward recommended that Defendant convene an ARD Committee (under the IDEA) for D.G. as well as Section 504 committee review. (A.R. 260-268.) At trial, Dr. Soward testified that D.G. would "qualify as other health impaired" on the basis of his ADHD. (Trial Transcript at 97.) Soward also testified that she would not consider a Section 504 plan to be successful if a student was continuously placed in an alternative school. (Trial Transcript at 111.)

notified of the IDEA Special Education Program, and Defendant declined to initiate IDEA evaluations. (A.R. 380, 2, 4, 9, 92, 414.) D.G.'s behavioral problems, such as sleeping in class, disregarding authority, failing to complete assignments and other disruptive behaviors continued. (See, e.g., A.R. 399, 400, 402, 408.) Certain teachers believed that the Section 504 accommodations were insufficient to address D.G.'s needs. (A.R. 394-96, 399.)

In March 2009, D.G. was again sent to SDGC, following several disciplinary incidents involving disruptive behavior in class. (A.R. 439-444.) As had occurred in the fall, D.G. was placed in SDGC for a period of 31 "successful" days, and ultimately remained there until May 5, 2009. (A.R. 371-72; 241, 243.) In total, D.G. spent approximately 100 days in the SDGC during the 2008-2009 school year. (Trial Transcript at 17.) On March 11, 2009, Defendant began to examine whether there was a link between D.G.'s ADHD and his disciplinary problems, which led to the SDGC referral, but found none. (A.R. 236; 238.) The Section 504 committee, however, updated D.G.'s behavioral plan such that the tea which had previously been provided would be available as a reward for completing assignments, rather than given as a means to increase alertness. (A.R. 577; 240.) The Behavioral Intervention Plan also included numerous other behavioral modifications, such as reinforcing appropriate behavior, providing in-class moving around time, communications with the parent, and other suggestions. (A.R. 240.) Notably, the March 11, 2009 Section 504 evaluation stated that D.G. had ADHD, and this disability impairs D.G.'s "ability to understand the impact and consequences of the behavior subject to discipline." (A.R. 236.) D.G.'s behavioral problems continued in spring 2009, while in SDGC. (A.R. 433, 435, 436, 438, 330-368.)

In April 2009, Dr. Jerry Tomasovic (a neurologist) diagnosed D.G. with Tourette's Syndrome, and thereafter B.G. provided Dr. Tomasovic's report to Defendant. (A.R. 234.) Thus, by April 2009 Defendant was aware that D.G. had been diagnosed with both Tourette's Syndrome and ADHD, which were a potential cause of his behaviors. (A.R. 334.) D.G.'s behavioral problems in SDGC continued throughout the spring 2009 semester (January through May 2009), and he received many failing grades in the 2008-2009 school year. (A.R. 324, 325, 491, 421-450.)

Another Section 504 evaluation was completed in May 2009. This evaluation concluded that D.G. would receive general education with Section 504 services, and noted that D.G. had ADHD, which impacted his "learning." (A.R. 216-218.) A Behavior Intervention Plan was set up in May 2009, which established certain modifications to alter his behavior, such as meetings with counselors, cooling off periods, and reinforcement of appropriate behaviors. (A.R. 219-223.) Teacher evaluation forms for this period noted D.G.'s behavioral and attendance problems. (A.R. 224-230.) D.G.'s grade report for the 2008-2009 school year generally showed grades in the 70s-90s range. (A.R. 324.)

Plaintiff first requested an IDEA administrative due process hearing on April 29, 2009, to obtain additional services. (A.R. 52.) The due process hearing was initially set for June 9, 2009, but was rescheduled numerous times, ultimately until December 2009. (A.R. 56-57; 93-96.) The results of this hearing are addressed below.

When D.G. returned to school in August 2009, he again exhibited behavioral problems. (A.R. 555-557.) The record contains several notices of behavioral problems due to violations of the dress code, tardiness, truancy, and disruptive classroom behavior.

(A.R. 207-210.) Defendant conducted a Functional Behavior Assessment ("FBA") in September 2009, in order to update his Section 504 plan. D.G.'s Section 504 again noted that D.G. had "ADHD," and that this impacted his "learning." (A.R. 547; 185.) The Section 504 evaluation included numerous reports from D.G.'s teachers, who generally reported that D.G. was a bright student, but had behavioral problems, or had been absent from class altogether. (A.R. 558-571; 187; 193-206.) The evaluation concluded, however, that D.G. would remain eligible only for Section 504 services, which changed very little from those offered the previous year. (A.R. 548-549; 551-552.)

On September 23, 2009, B.G. requested a Full and Individual Evaluation ("FIE") under IDEA for special education services. (A.R. 542-545; 500.) The FIE, completed in October 2009, addressed potential emotional disturbance as well as "autism or other pervasive developmental disorders." In each case, D.G. was found not to demonstrate characteristics of either disorder. (A.R. 539-540; 148.) Even so, the FIE recommended that "the ARD Committee discuss whether to address [D.G.'s] history of ADHD through Section 504 or Special Education," and provide other coaching. (A.R. 541.)

Defendant engaged Dr. Paul Hamilton (a licensed school psychologist) to evaluate D.G. for the FIE. Dr. Hamilton's results were reported in October 2009. (A.R. 529.) Dr. Hamilton's report recommended an Admissions, Review, and Dismissal Committee ("ARD Committee"), an IDEA procedure, to consider D.G.'s special education eligibility due to his ADHD. (A.R. 529, 538.) Dr. Hamilton's report summarized D.G.'s current assessments and diagnoses, along with previous reports by Drs. Horvat, Soward, and Tomasovic. Notably, Dr. Hamilton reported under "diagnostic impressions," ADHD, Tourette's Syndrome, and a personality disorder. D.G. was also

evaluated for Asperberger's Syndrome, but Dr. Hamilton determined that he probably did not have this particular syndrome. (A.R. 529; 530-538.) Dr. Hamilton concluded, "it is recommended that [D.G.'s] parents continue his medications to help alleviate or control his symptoms." (A.R. 538.) At trial, Dr. Hamilton testified that when he evaluated D.G. in September 2009, shortly after the start of the school year, he did "not assess" for ADHD directly. He stated that most of D.G.'s behavioral problems indicated "oppositional behavior." (Trial Transcript at 148-149.) Dr. Hamilton also testified, however, that he did not receive reports from certain other professional evaluators, and was unaware as to how long D.G. had been at SDGC. (Trial Transcript at 149-150, 158-159.) Notably, Dr. Hamilton also testified that by September 2009 he knew that D.G. had been diagnosed in Tourette's, and thus knew about the potential of D.G. being considered "other health impaired." (Trial Transcript at 164.)

An October 27, 2009 FBA report again stated that D.G. fell within applicable Section 504 criteria, but was not eligible for special education services. The FBA, however, noted D.G.'s diagnosis of Tourette's and ADHD, and recommended certain strategies to counteract behavioral problems such as failure to complete assignments, opposition to authority figures, and disruptive behavior. (A.R. 163-168.)

An ARD Committee meeting was convened on November 5, 2009. At the ARD Committee meeting, Defendant's representatives were presented with the reports of Dr. Hamilton, Dr. Tomasovic, Dr. Soward, Dr. Horvat, and Dr. Fisher. (A.R. 518-520.) These reports mentioned Tourette's Syndrome and ADHD. Despite knowledge of D.G.'s behavioral and medical problems, Defendant did not obtain medical forms necessary for an IDEA "Other Health Impaired" ("OHI") eligibility based on his ADHD before the

meeting. Only during the November 2009 meeting did Defendant give B.G. a medical OHI eligibility form, upon request. (A.R. 520; A.R. 140; Hearing Transcript at 132-133; Trial Transcript at 83.) B.G. testified at the administrative hearing that Defendant never provided her with an OHI form prior to that time. (Hearing Transcript at 208-209.)[4] After the November 2009 ARD meeting, Defendant's representatives again failed to recommend that D.G. receive IDEA special education services. (A.R. 520; A.R. 138; Trial Transcript at 30.)

The OHI forms were completed in late November 2009. An OHI form prepared by Dr. Candas stated that D.G. met the criteria for other health impairment, due to "ADD, Hypersomnia, Narcolepsy, [and] Rhemateid [sic] Arthritis," all of which were rated at the "moderate" level. (A.R. 132.) Dr. Candas also testified before the hearing officer at the due process hearing that D.G. had ADHD and symptoms of Tourette's Syndrome. He stated that the School District never contacted him regarding D.G.'s condition. (Hearing Transcript at 95-98.) Another OHI form was prepared by Dr. Adriana Pop-Moody, who also rated D.G. as other health impaired due to rheumatoid arthritis, resulting in mobility difficulties, difficulties performing classroom activities, difficulties maintaining alertness. She recommended increased rest periods, as well as additional time for stretching and walking. (A.R. 135; see also Hearing Transcript at 66.) Dr. Pop-Moody described D.G.'s rheumatoid arthritis symptoms in detail during trial, and explained the difficulties it would create for D.G. in attending school. She also explained that D.G.'s rheumatoid arthritis worsened in 2010, at which point she recommended a shortened day. (Trial

---

[4] Christine Brown, also testifying at the administrative hearing, stated that the OHI form was provided only after the November ARD meeting, and only after parental request. (Hearing Transcript at 283.)

Transcript at 86-91.)[5]  Dr. Pop-Moody did not, however, make any specific recommendations to Flour Bluff ISD regarding accommodations or Section 504 versus IDEA services. (Hearing Transcript at 73.)

During the administrative hearing, school counselor Karl Witt testified that, at around the time of the December 2009 hearing, D.G. had been doing much better in school and had exhibited better behaviors. (Hearing Transcript at 218.) He noted that the SAT team received documentation that D.G. had ADHD, and "we took that into consideration and went ahead and moved forward with a Section 504." (Hearing Transcript at 220.) He also testified that "family stressors" contributed to D.G.'s behavioral problems. He concluded that Section 504 accommodations were appropriate for D.G. (Hearing Transcript at 221-222.) With respect to whether special education was necessary, Mr. Witt testified that he concluded that D.G. did not qualify for special education after the November 2009 ARD meeting because "the plan we had in place under Section 504 was meeting all of his needs. He was being academically successful." (Hearing Transcript at 223.) Nevertheless, Mr. Witt also labeled as "successful" D.G.'s 2008-2009 school year, in which he spent approximately 100 days in SDGC and failed two classes. (Hearing Transcript at 229.) Several of D.G.'s teachers, as well as several others involved with the ARD meeting, testified at the administrative hearing that D.G. was presently performing well in school, and was properly accommodated under the Section 504 plan. (Hearing Transcript at 244-245; 249; 256; 263; 267-268; 297-300; 314; 326.) These teachers also testified similarly during trial, explaining that D.G.

---

[5] D.G. himself testified at trial. He stated that his ADHD limits his "ability to focus in class and it causes [him] to have impulsive behaviors that disrupt the class." (Trial Transcript at 115.) He also stated that his rheumatoid arthritis makes him feel "fatigued" and in pain, and testified as to his difficulties in the regular classroom setting. (Trial Transcript at 116.)

generally performed well in class, was generally well behaved, and did not need additional accommodations beyond those provided under Section 504. (Trial Transcript at 182-197; 199-219; 220-226; 234-261.) Along these same lines, Dr. Julie Carbajal testified at trial that D.G.'s needs were being met under Section 504, and special education services were provided in January 2010 only after new medical information (regarding rheumatoid arthritis) became available. (Trial Transcript at 328-329.)[6] Meanwhile, throughout the fall 2009 term, D.G. continued to receive poor grades (or in some cases failing grades) in several of his courses. (A.R. 109-112 (Chemistry); 113-116 (English)). He, however, did very well in certain other courses. (A.R. 121-122 ("A" in Sociology); 123-124 ("A" or "B" in Theatre Arts); 125-128 ("B" in World History).)

At the December 2009 administrative due process hearing, the hearing officer found no problem with Defendant's Section 504 educational program for D.G, and did not find that IDEA services were appropriate. (A.R. 4-8; 13.) The hearing officer's report does not contain a detailed explanation as to how he arrived at his conclusions.

Finally, in January 2010 the ARD committee met again and determined that D.G. was eligible for IDEA special education services with OHI classification because of his rheumatoid arthritis (but not his ADHD or Tourette's Syndrome). (Trial Transcript at 26, 78.) After January 2010, Defendant addressed D.G.'s needs under IDEA by providing him with four hours of instruction per week at home. (Trial Transcript at 40, 78-79, 115, 294.) Sharon Chapman testified at trial that the School District no longer disputes that D.G. has ADHD, even if it still disputes the Tourette's Syndrome diagnosis. (Trial

---

[6] D.G.'s father also testified at trial, explaining his attempts to home school D.G., his views as to whether D.G. had Tourette's Syndrome, and related considerations. However, when pressed, he acknowledged that he had spent "little time" with D.G. over the past four years, in fact not even a full day during that time. (Trial Transcript at 269, 272.) The Court therefore does not find the father's testimony at all useful in resolving this matter. (Trial Transcript at 275.)

Transcript at 300-301.) With these new policies in place, D.G. passed his classes for the 2009-2010 school year. (A.R. 572.) Presently, the parties agree that D.G. is receiving all of the special education services to which he is entitled. (March 23, 2011 Status Conference at 8.)

III.   **Conclusions of Law**

   A.   **Standard of Review**

"When a district court reviews a hearing officer's decision under the IDEA program, it receives the records of the administrative proceedings and also takes additional evidence at the request of any party. Although the district court must accord 'due weight' to the hearing officer's findings, the court must ultimately reach an independent decision based on a preponderance of the evidence. Thus, the district court's review is 'virtually de novo.'" Houston Independent School Dist. v. V.P. ex rel. Juan P., 582 F.3d 576, 582-83 (5th Cir. 2009). The Court here conducts an essentially de novo review of the facts.

   B.   **IDEA Child Find Provision**

      1.   **Applicable Law**

IDEA's Child Find obligation imposes on each local educational agency an affirmative duty to have policies and procedures in place to locate and timely evaluate children with suspected disabilities in its jurisdiction, including "[c]hildren who are suspected of being a child with a disability . . . and in need of special education, even though they are advancing from grade to grade[.]" 34 C.F.R. §§ 300.111(a), (c)(1); see 20 U.S.C. § 1412 (imposing on each state and local educational agency the affirmative duty

to identify, locate, and evaluate all children with disabilities within its jurisdiction).[7] The Child Find duty is triggered when the local educational agency has reason to suspect a disability coupled with reason to suspect that special education services may be needed to address that disability. When these suspicions arise, the local educational agency "must evaluate the student within a reasonable time after school officials have notice of behavior likely to indicate a disability." El Paso ISD v. Richard R., 567 F. Supp. 2d 918, 950 (W.D. Tex. 2008) (citations omitted).

"Upon judicial review . . . the Court must undertake a two-part inquiry to determine whether a local educational agency has complied with its Child Find responsibilities. First, the Court must examine whether the local educational agency had reason to suspect that a student had a disability, and whether that agency had reason to suspect that special education services might be needed to address that disability. Next, the Court must determine if the local educational agency evaluated the student within a reasonable time after having notice of the behavior likely to indicate a disability." Id.

There is no bright line rule as to what constitutes a "reasonable time," and the Fifth Circuit has yet to rule on this issue. Certain courts have found periods as short as a few months as unreasonable, whereas others have found periods a year or longer to be reasonable, depending on the circumstances. Compare El Paso ISD, 567 F. Supp. 2d at 952 (finding that a thirteen month period between a request for an evaluation and school district's offer of evaluation was unreasonable; New Paltz Cent. Sch. Dist. v. St. Pierre ex

---

[7] 20 U.S.C. § 1412(3)(A) provides: "All children with disabilities residing in the State, including children with disabilities who are homeless children or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services."

rel. M.S., 307 F. Supp. 2d 394, 401 (N.D.N.Y. 2004) (holding that a delay of approximately ten months from the time mother informed school district that son was experiencing difficulties until performance of comprehensive evaluation constituted a Child Find violation); Dep't of Educ., State of Hawaii v. Cari Rae S., 158 F. Supp. 2d 1190, 1195-97 (D. Hawaii 2001) (finding that a delay of at least six months from point at which school had reason to suspect child had disability to scheduling of evaluation constituted a Child Find violation), with W.B. v. Matula, 67 F.3d 484, 501 (3d Cir. 1995) (holding that a delay of six months from observation of behavior until referral for evaluation constituted a triable issue as to Child Find violation); O.F. ex rel. N.S. v. Chester Upland Sch. Dist., 246 F. Supp. 2d 409, 417-18 (E.D. Pa. 2002) (finding triable issue as to whether a nearly twelve month delay from observation that child was having emotional difficulties in school until completion of comprehensive evaluation constituted a Child Find violation).

### 2. Application

In this case, the facts establish that "the local educational agency had reason to suspect that a student had a disability, and . . . [the] agency had reason to suspect that special education services might be needed to address that disability." Id. D.G.'s hyperactivity in class (both in regular classes and at SDGC), impulsive behaviors, uncontrollable vocalizations, and related activities should have made Defendant suspect that D.G. had a disability, and that special education services may be necessary. As noted above, D.G. exhibited marked behavioral changes in the fall of 2008, resulting in his placement in SDGC and extended stay there. Prior to that time, D.G. had no significant behavioral problems in school, and there should have at least been an

indication that his behavioral changes were due to an underlying disability. In November 2008, Defendant was in possession of Dr. Horvat's ADHD diagnosis and requests by B.G. for additional services; they were also aware that D.G. had serious behavioral problems. Rather than follow-up or investigate the possibility of D.G.'s problems any further, the School District allowed D.G. to remain in the disciplinary SDGC program for almost the entire 2008-2009 school year. It was not until January 2009 that D.G. was assessed for Section 504 eligibility, let alone eligibility for IDEA services. During that assessment, more behavioral problems came to light through teacher assessments. Those problems continued thereafter, and D.G. was again placed in SDGC in March 2009. While the evidence available may not have established D.G.'s medical impairments to a complete certainty, there was clearly enough in the record to conclude that Defendant "had reason to suspect" that D.G. had a disability, and "had reason to suspect that special education services might be needed to address that disability." El Paso ISD, 567 F. Supp. 2d at 950.

The next question is whether Defendant evaluated D.G. "within a reasonable time" after noticing the behavior at issue. The first ARD Committee meeting did not occur until November 2009, and then only after B.G. requested such a meeting. This meeting occurred without the benefit of a completed OHI form. Even after the meetings, Defendant decided that D.G. should not receive services under IDEA, and that accommodation under Section 504 was sufficient. It was not until January 2010 that IDEA special education services were made available.

Rather than take the necessary steps to determine whether IDEA special education services were necessary, in light of D.G.'s continued behavioral problems and the

15 / 18

apparent ineffectiveness of Section 504 accommodations, Defendant continued to maintain the status quo. It did not conduct an evaluation under IDEA until approximately a year after D.G.'s problems first began to manifest themselves, and did not provide special education services until January 2010. As noted above, there is no bright line rule as to what constitutes a "reasonable time." The Court concludes in this case that the IDEA evaluation did not occur within a reasonable time after Defendant had notice of the behavior likely to indicate D.G.'s disability. Such an evaluation should have occurred within a few months of D.G.'s mounting behavioral problems, and he should not have been allowed to languish in the disciplinary program at SDGC for almost an entire academic year before he was evaluated for IDEA services. The evaluation should likely have occurred at the latest sometime in early 2009, after D.G.'s significant problems developed in the fall of 2008.

In sum, the court finds that by November 2008, Defendant Flour Bluff ISD "had reason to suspect that [D.G.] had a disability, and . . . had reason to suspect that special education services might be needed to address that disability." El Paso ISD, 567 F. Supp. 2d at 950. Moreover, the Court finds that Defendant did not evaluate D.G. "within a reasonable time after having notice of the behavior likely to indicate a disability," Id., as it did not conduct an ARD meeting until November 2009. Defendant thus violated IDEA's Child Find provision. 20 U.S.C. § 1412(3)(A).

### C. Relief

Plaintiff requests that he receive "an award in the amount of one year of compensatory educational services under IDEA," in light of "Defendant's failure to timely evaluated D.G. for eligibility based on his ADHD and Tourette's Syndrome,"

which "constitute[s] [a] per se violation[] of IDEA." (D.E. 40 at 30-31.) Plaintiff also seeks an "award of attorney's fees for time spent litigating the special education due process hearing and proceedings before this Court," as the prevailing party herein. (D.E. 40 at 31.)

As one court has explained, "IDEA relief depends on 'equitable considerations.' Accordingly, compensatory education is not a contractual remedy, but an equitable remedy, part of the court's resources in crafting appropriate relief. . . . [C]ompensatory education involves discretionary, prospective, injunctive relief crafted by a court to remedy what might be termed an educational deficit created by an educational agency's failure over a given period of time to provide a FAPE to a student. . . . [T]here is no obligation to provide a day-for-day compensation for time missed. Appropriate relief is relief designed to ensure that the student is appropriately educated within the meaning of the IDEA." Reid ex rel. Reid v. District of Columbia, 401 F.3d 516, 523-24 (D.C. Cir. 2005) (citations omitted).

Here, the Court concludes that Plaintiff's requested relief of one year of compensatory educational services under IDEA is appropriate, in light of the 2008-2009 school year in which D.G. was placed in SDGC and did not receive IDEA services. The Court therefore orders such compensatory educational services.

IDEA provides for attorneys fees in the Court's discretion. The statute states, "[i]n any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs--(I) to a prevailing party who is the parent of a child with a disability." § 1415(i)(3)(B)(i)(I). The Court finds that Plaintiff is

the "prevailing party" as that term is used in the IDEA.[8] As such, Plaintiff is entitled to reasonable attorney's fees. Counsel for Plaintiff shall submit, within 7 days of this Order, a request for attorney's fees (covering all attorney's fees up to and including fees for submission of the post-trial briefing). Defendant may respond 7 days thereafter.

## IV. Conclusion

For the reasons stated above, the Court concludes that Defendant Flour Bluff ISD violated the Child Find Provision of IDEA. 20 U.S.C. § 1412(3)(A). The Court awards relief as follows:

(1) Plaintiff D.G. is entitled to one year of compensatory educational services under the IDEA.

(2) Plaintiff D.G. is entitled to an award of attorney's fees in an amount to be determined after additional briefing on this subject.

SIGNED and ORDERED this 24th day of May, 2011.

_____
Janis Graham Jack
United States District Judge

---

[8] "To achieve prevailing-party status, a party must attain both: a remedy that alters the legal relationship between the parties and fosters IDEA's purposes; and some judicial imprimatur on a material alteration of the legal relationship." Gary G. v. El Paso Indep. Sch. Dist., 632 F.2d 201, 207 (5th Cir. 2011). This test is plainly met here, in light of the Court's findings.